## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**vs.**                                                                                                          **No. 2:14-cv-0352 RB/WPL**

**8965 ARROYO ROAD,**
**LAS CRUCES, NEW MEXICO 88012**

**MORE PARTICULARLY DESCRIBED AS:**
**LOT 2B, OF LORI SUMMARY SUBDIVISION**
**REPLAT NO. 1, LOCATED IN THE COUNTY OF**
**DOÑA ANA, STATE OF NEW MEXICO AS**
**SHOWN ON PLAT THEREOF RECORDED ON**
**FEBRUARY 8, 1989 IN PLAT BOOK 16, AT**
**PAGE(S) 34 AS PLAT NO. 1932, RECORDS OF**
**DOÑA ANA COUNTY,**

    **Defendant,**

**and**

**LUZ A. DOMINGUEZ,**

    **Claimant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff's Motion for Summary Judgment. (Doc. 50.) The Court's jurisdiction arises under 28 U.S.C. § 1331. Having considered the submissions of counsel and relevant law, the Court **GRANTS** this motion.

**I.     BACKGROUND**

On April 15, 2014, the United States brought this *in rem* forfeiture action against the real

property located at 8965 Arroyo Road in Las Cruces, New Mexico (hereinafter "the Property") alleging that the Property is subject to forfeiture because: (1) it was involved in a financial transaction to conceal the proceeds of drug trafficking, *see* 18 U.S.C. § 981(a)(1)(A); it was purchased with drug proceeds, *see* 21 U.S.C. § 881(a)(6); and/or (3) it was used to facilitate a felony drug trafficking offense, *see* 21 U.S.C. § 881 (a)(7). (Doc. 1.) On May 13 and 23, 2014, Claimant Luz A. Dominguez, the holder of legal title to the Property, filed an answer and verified proof of claim challenging the forfeiture of the Property. (Docs. 7 and 8.)

The United States moves for summary judgment on the grounds that the record establishes that the Property was purchased with the proceeds of drug trafficking by Eidolfo Dominguez-Lopez[1] and that Claimant Dominguez, the sister of Eidolfo Dominguez-Lopez, was listed as a straw owner in order to conceal the source of drug-trafficking proceeds used to purchase the Property. Claimant Dominguez opposes the motion and contends that genuine issues of material fact exist as to whether the Property is subject to forfeiture.

## II.   LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014). The movant bears the burden of proving the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine dispute of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986); *Scott v. Harris*, 550 U.S. 372, 380 (2007). Although the material submitted by

---

[1] On September 20 2012, Eidolfo Dominguez-Lopez, Adrian Ordoñez (Claimant Dominguez's son), and Leonel Molinar, Jr. (Claimant Dominguez's nephew) were charged with criminal offenses related to drug trafficking and money laundering. *See United States v. Dominguez-Lopez, et al.*, No. 12-cr-2333 RB. The indictment alleged that the criminal activities occurred from January 23, 2012 through September 20, 2012. (Pl. Exs. 3 and. 4.)

the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 34 (10th Cir. 2013), the burden on the movant may be discharged by demonstrating that there is an absence of evidence to support the nonmovant's case. *Celotex*, 477 U.S. at 325. The Court views the facts in a light most favorable to the nonmovant and draws all reasonable inferences in that party's favor. *Tolan,* 134 S.Ct. at 1863.

### III.  FACTS IN THE LIGHT MOST FAVORABLE TO CLAIMANT DOMINGUEZ

The Property consists of a 2,600 square-foot main house and 760 square-foot casita situated on a one-and-one-third acre lot. (Pl. Ex. 7 at 11.) In 2004, Rogelio Pizarro and Andrea Flores purchased the lot for approximately $28,000.00. (*Id.*) On July 9, 2004, Mr. Pizarro obtained a building permit and, for several years, worked on the Property and spent approximately $50,000 on construction of the main house and the casita. (*Id.* at 13.)

In 2011, Mr. Pizarro and Ms. Flores decided to divorce and sell the Property. (Pl. Ex. 7 at 14; Pl. Ex. 8 at 10.) In order to find a buyer, Mr. Pizarro placed a sign in front of the Property with his telephone number, advertised the Property in the Thrifty Nickel, and listed the Property with Jake Mossman, a realtor with Exit Realty. (Pl. Ex. 7 at 15; Pl. Ex. 9 at 7.) At that time, the main house was approximately 50 to 60 percent complete and the casita was nearly finished on the inside. (Pl. Ex. 7 at 12; Pl. Ex. 9 at 8.) Mr. Mossman photographed the Property in July 2011, and priced it aggressively at $99,000.00 because Mr. Pizarro and Ms. Flores wanted to sell as soon as possible. (Pl. Ex. 9, 27–30.) Mr. Mossman testified in his deposition that the photographs set forth in Government Exhibits 27–30 are true and accurate depictions of the general condition of the Property as of July 2011. (*Id.* at 8–14.)

An individual who identified himself as "Lino Rivera" telephoned Mr. Pizarro and expressed an interest in buying the Property. (Pl. Ex. 7 at 16.) "Lino Rivera" is an alias used by Eidolfo Dominguez-Lopez, a convicted drug dealer and brother to Claimant Dominguez. (Pl. Ex. 7 at 16–18; Pl. Ex. 50 at 2.) Mr. Pizarro showed Eidolfo Dominguez-Lopez the Property and spoke with him on the telephone 15 to 20 times. (Pl. Ex. 7 at 17.) Claimant Dominguez states that she wanted to purchase Defendant 8965 Arroyo Road and asked her brother, Eidolfo Dominguez-Lopez, to help her with the negotiations. (Doc. 57-1.) However, Eidolfo Dominguez-Lopez told Mr. Pizarro that he was purchasing the property for himself. (Pl. Ex. 7 at 18.) Claimant Dominguez told Ms. Flores that she and her husband intended to live in the casita and Eidolfo Dominguez-Lopez and his family would reside in the main house. (Pl. Ex. 8 at 50-52.)

Eidolfo Dominguez-Lopez offered $80,000.00 to Mr. Pizarro to buy the Property. (Pl. Ex. 7 at 18.) According to Mr. Pizarro, Eidolfo Dominguez-Lopez asked if he "could make the deal with $30,000, and then pay the remaining 50 (thousand) with cash to prevent taxes." (*Id.*) According to Claimant Dominguez, Mr. Pizarro demanded the side cash deal because of his divorce, bankruptcy, and to avoid paying full commission to Mr. Mossman. (Doc. 57-1.)

On August 24, 2011, Claimant Dominguez, Eidolfo Dominguez-Lopez, Mr. Pizarro, Ms. Flores, and Mr. Mossman met at the Exit Reality office to finalize a purchase agreement for the Property. (Pl. Ex. 9 at 24–25.) Eidolfo Dominguez-Lopez and Mr. Pizarro were the primary participants in the meeting. (*Id.* at 28.) Mr. Pizarro and Claimant Dominguez signed a purchase agreement for $30,000.00, which was substantially below the market value of the Property. The purchase agreement provided that $1,000.00 in earnest money would be escrowed and closing

would be through Southwest Abstract and Title Company. (Pl. Ex. 9 at 19; Pl. Ex. 21 at 12-13.)

Eidolfo Dominguez-Lopez tried to pay the $1,000.00 earnest money in cash, but Mr. Mossman was unable to accept cash. (Pl. Ex. 9 at 32–33.) Eidolfo Dominguez-Lopez and Mr. Pizarro left the office and returned with a money order for $1,000.00 from Bank of America. (*Id.* at 33–34.) Claimant Dominguez and Ms. Flores waited with Mr. Mossman at the Exit Realty office until Eidolfo Dominguez-Lopez and Mr. Pizarro returned with the money order. (*Id.* at 33.) Claimant Dominguez signed the $1,000.00 money order that had been purchased by Eidolfo Dominguez-Lopez. (*Id.* at 35.) Subsequently, the August 24, 2011 purchase agreement was terminated because the title company could not obtain title insurance for the Property. (Pl. Ex. 22.)

On February 9, 2012, Claimant Dominguez and Mr. Pizarro signed a second purchase agreement for the Property. (Pl. Ex. 24 at 3; 12–13.) The second purchase agreement listed the purchase price as $30,000.00 cash, including $1,000 to be escrowed as earnest money with closing through Bueno Title and Escrow Company. (*Id.*) On March 23, 2012, Claimant Dominguez purchased a cashier's check from JPMorgan Chase Bank in the amount of $28,981.05. (Pl. Ex. 26 at 24–25.) On March 23, 2012, the deal closed and title to the Property was transferred to Claimant Dominguez and her husband, Jesus Ordoñez. (Docs. 1, 7; Pl. Ex. 7 at 21.) On the same day, Jesus Ordoñez transferred title to the Property from himself and Claimant Dominguez to Claimant Dominguez as her sole and separate property. (*Id.*) The Doña Ana County Assessor's Office's 2012 property valuation of the Property was $141,911.00. (Pl. Ex. 15.)

In addition to the $30,000.00 purchase price that went through the title company, Eidolfo

5

Dominguez-Lopez paid Ms. Flores $25,000.00 in cash in the Hooters Restaurant parking lot on March 23, 2012. (Pl. Ex. 7 at 27; Pl. Ex. 8 at 15.) On the same day, Eidolfo Dominguez-Lopez paid Mr. Pizarro $15,000.00 in cash in the parking lot of Bueno Title. (Pl. Ex. 7 at 32.) About four or five days later, Mr. Pizarro contacted Mr. Dominguez-Lopez about the other $10,000.00. (*Id.*) Eidolfo Dominguez-Lopez told Mr. Pizarro that if he wanted the money he needed to pick it up. (*Id.* at 32–33.) Mr. Pizarro sent his wife to pick up the money and Eidolfo Dominguez-Lopez gave her $10,000.00 in cash. (Pl. Ex. 7 at 33.)

Mr. Mossman observed that Eidolfo Dominguez-Lopez provided the money for the transaction and took charge of the transaction while Claimant Dominguez remained passive. (Pl. Ex. 9 at 27–28.) Mr. Mossman understood that that even though Claimant Dominguez was listed as the buyer, Eidolfo Dominguez-Lopez was the actual buyer. (*Id.* at 26–27.) Mr. Pizarro dealt only with Eidolfo Dominguez-Lopez; Mr. Pizarro did not deal with Claimant Dominguez. (Pl. Ex. 7 at 18–19; 26.) Mr. Pizarro did not meet Claimant Dominguez until the first purchase agreement was signed. (*Id.* at 25.) Eidolfo Dominguez-Lopez was the person who provided the money for the purchase of the property. (*Id.*) Similarly, Ms. Flores believed that Eidolfo Dominguez-Lopez was "running the show" because Eidolfo Dominguez-Lopez negotiated the price and asked Jesus Ordoñez to leave the meeting at Exit Realty. (Pl. Ex. 8 at 17–18.)

On April 4, 2012, Doña Ana County issued a building permit to Claimant Dominguez and Merlin Enterprises to continue construction on Defendant 8965 Arroyo Road. (Pl. Ex. 12.) The permit stated that Merlin Enterprises was taking over construction for the new owner. (*Id.*) On May 7, 2012, Doña Ana County issued a mechanical/plumbing permit to Claimant Dominguez and Sid's Plumbing. (Pl. Ex. 13.) On June 6, 2012, a Doña Ana County building

inspector gave final approval for the insulation.  (Pl. Ex. 12.)  On October 31, 2012, a Doña Ana County building inspector gave final inspection approval for the plumbing and HVAC system. (Pl. Ex. 13.)

On September 27, 2012, federal agents executed a search warrant on Eidolfo Dominguez-Lopez's residence at 12091 Buffalo Estates, Las Cruces, New Mexico.  (Pl. Ex. 33.)  Agents found construction receipts and other documents related to improvements on the Property at Eidolfo Dominguez-Lopez's home including: (1) an estimate from O.C. Browning & Son LLC, dated September 20, 2011, addressed to "Lino," which quoted a price of $11,300.00 for new residential electrical installation; (2) a proposal from Ontiveros Insulation Company, Inc., dated May 4, 2012, which quoted a price of $12,584.81 to install insulation and sheetrock; (3) a cash sales invoice from L&P Building Supply & Components, dated May 14, 2012, signed by "Lino Rivera"; (4) an invoice, dated May 29, 2012, for kitchen and bath cabinets, which were sold to "Lino Ribera" for $5,500.00; (5) documents from Home Depot, dated June 10, 2012 and July 11, 2012, related to the purchase and delivery of tile; (6) an invoice from Western Stoves & Fireplaces, dated June 1, 2012; (7) proposal documents from Merlin Enterprises General & Electrical Contracting, dated April 16, 2012, addressed to "Luz Dominguez" estimating the cost of correcting, rebuilding, and wiring the Property at $14,850.00 and $9,200.00, respectively; and (8) an invoice from DWS Building Supply, dated June 6, 2012, for $2,578.78 worth of sheetrock. (Pl. Exs. 33–41.)  The photographs in Government Exhibit 32 show the condition of the Property on September 27, 2012.  A comparison of the July 2011 photographs with the September 2012 photographs reveals that a substantial investment had been made to complete construction on the property.  (*Compare* Pl. Exs. 27–30 *with* Pl. Ex. 32.)  The improvements are reflected on the

Doña Ana County Assessor's Office valuation of the Property, which increased from $141,911.00 for 2012, to $270,000.00 for 2013, to $302,200.00 for 2014, to $311,266.00 for 2015. (Pl. Exs. 14–18.)

On September 27, 2012, federal agents executed a search warrant on the Property. (Pl. Exs. 31; 61.) During the course of the search, a police canine alerted to a gold 2000 Nissan Maxima sedan, which was parked at the Property. (Pl. Ex. 61; Pl. Ex. 62 at 3.) A search of the vehicle revealed that the middle air conditioning vent on the dashboard had been removed and tool marks were evident on the bolt heads holding the factory installed radio to the mounting brackets. (Pl. Ex. 62 at 3.) The search results indicate that the vehicle had been used to smuggle controlled substances. (*Id.*)

On September 20 2012, Eidolfo Dominguez-Lopez, Adrian Ordoñez (Claimant Dominguez's son), and Leonel Molinar, Jr. (Claimant Dominguez's nephew) were charged with criminal offenses related to drug trafficking and money laundering. *See United States v. Dominguez-Lopez, et al.*, No. 2:12-cr-2333 RB. The indictment alleged that the criminal activities occurred between January 23, 2012 and September 20, 2012. (Pl. Ex. 3 at 2–30; Pl. Ex. 4 at 1.) In 2014, Eidolfo Dominguez-Lopez, Mr. Molinar(Claimant Dominguez's nephew), and Adrian Ordoñez (Claimant Dominguez's son) were convicted of drug trafficking conspiracy, money laundering conspiracy, and unlawful use of communications facilities. (*Id.*; Pl. Ex. 4.) Mr. Molinar and Adrian Ordoñez were convicted of similar crimes in the same case. (*Id.*; Pl. Exs. 5–6.) Claimant Dominguez states in her affidavit that she did not know that her family members were involved in illegal activities until after they were arrested. (Doc. 57-1.)

From January 2011 to July 2012, Claimant Dominguez lived at Eidolfo Dominguez-

Lopez's residence at 12091 Buffalo Estates Road in Las Cruces. (Pl. Ex. 1 at 2; Pl. Ex. 20 at 3; Pl. Ex. 33 at 2.) From July 2012 to March 2014, Claimant Dominguez lived with Adrian Ordoñez, in Denver, Colorado. (Pl. Ex. 1 at 2; Pl. Ex. 10 at 2; Pl. Ex. 50 at 1.) Claimant Dominguez has lived at the Property since March 2014. (Pl. Ex. 1.) Eidolfo Dominguez-Lopez's wife, Maria Vidales, and their children also live at the Property. (*Id*.)

Claimant Dominguez did not file federal tax returns for 2010, 2011, 2012, 2013, and 2014. (Pl. Exs. 44–48.) Claimant Dominguez and Jesus Ordoñez did not file federal tax returns for 2008, 2009, 2010, and 2011. (Pl. Ex. 43.) On their 2007 joint federal tax return Claimant Dominguez and Jesus Ordoñez reported their total income as $13,500.00. (Pl. Ex. 42 at 1.) On the 2007 tax return, Claimant Dominguez listed her occupation as "Homemaker" and Jesus Ordoñez listed his occupation as "Laborer." (Pl. Ex. 42 at 2.)

On their 2011 joint federal tax return, Eidolfo Dominguez-Lopez and his wife claimed their total income was $39,489.00. (Pl. Ex. 60 at 1.) Eidolfo Dominguez-Lopez listed his occupation as owner of a "trailer transport" company and his wife listed her occupation as "homemaker." (*Id*.) On their 2010 joint federal tax return, Eidolfo Dominguez-Lopez and his wife claimed their total income was $39,047.00. (Pl. Ex. 59 at 1.) On their 2009 joint federal tax return, Eidolfo Dominguez-Lopez and his wife claimed their total income was $9,303.00. (Pl. Ex. 58 at 1.) On their 2008 joint federal tax return, Eidolfo Dominguez-Lopez and his wife claimed their total income was $21,962.00. (Pl. Ex. 57 at 1.) On their 2007 joint federal tax return, Eidolfo Dominguez-Lopez and his wife claimed their total income was $19,194.00. (Pl. Ex. 56 at 1.)

Claimant Dominguez has produced documents indicating that she sold a property located

at 8285 Lucky Drive, El Paso, Texas to Osvaldo Molina on May 5, 2011.  (Pl. Ex. 52 at 1; Pl. Ex. 54 at 2.)  According to the purchase agreement, Osvaldo Molina agreed to pay Claimant Dominguez $65,000.00 at zero percent interest in equal monthly installments of $2,500.00 on the tenth day of each month beginning May 10, 2011 and continuing thereafter for 26 months.  (Pl. Ex. 52 at 4.)  Claimant Dominguez produced handwritten receipts for cash payments totaling $55,500.00 from Osvaldo Molina between May 2011 and August 2012.  (Pl. Ex. 52 at 4; Pl. Ex. 53 at 1–3.)  Between February 7 and May 5, 2011, Claimant Dominguez paid $14,750.00 past due property taxes on 8285 Lucky Drive.  (Pl. Ex. 55 at 1–4.)  On his 2008 federal tax return, Mr. Dominguez-Lopez reported rental income from 8285 Lucky Drive.  (Pl. Ex. 57 at 8.)

Between May 5, 2011 and March 23, 2012, the date that the Property was purchased, $41,500.00 was deposited into Claimant Dominguez's savings account at JP Morgan Chase Bank (hereinafter "Chase bank account").  (Pl. Ex. 26 at 2–36.)  The cash deposits were in amounts of between $3,000.00 and $8,000.00.  (Doc. 33 at 6.)  After the purchase of the Property, no additional funds were deposited into the Chase bank account.  (Doc. 1 at 4; Doc. 33 at 6.)  In October 2012, the Chase bank account had a balance of $68.24.  (Doc. 1 at 4; Doc. 33 at 6.)

On March 26, 2012, Claimant Dominguez withdrew $28,981.05 from the Chase bank account to purchase the $28,981.05 cashier's check for the closing on the Property.  (Pl. Ex. 26 at 23–25; Pl. Ex. 49 at 1.)  Claimant Dominguez never had sufficient funds in her Chase bank account to make the additional cash payments totaling $50,000.00 to Mr. Pizarro and Ms. Flores.  (Pl. Ex. 26 at 2–27.)  Including the funds received from Osvaldo Molina for the sale of 8285 Lucky Drive, Claimant Dominguez lacked sufficient legitimate income to pay the full purchase price of the Property and for the costs to finalize construction of the Property.  (*Id.*; Pl. Ex. 43;

Doc. 33 at 6–8, 11–12.)

Claimant Dominguez asserts in an affidavit attached to her response that she purchased the property with proceeds from (1) a sale of cattle in Chihuahua, Mexico; (2) property given to her by her father; (3) proceeds from a sale of property in El Paso, Texas (presumably 8285 Lucky Drive); and (4) money she earned and saved. (Doc. 57-1.) However, Claimant Dominguez submitted no documentation that would support any of these claims.[2] Additionally, as a discovery sanction, United States Magistrate Judge William P. Lynch held that: (1) no documentation relating to payments from Claimant Dominguez's parents exists because no such payments were made; (2) Claimant Dominguez and her husband have not had any employment since 2010; (3) other than her Chase bank account, Claimant Dominguez and her husband have not had any other accounts, business transactions, financial dealings, or loans with any business entities, financial institutions, or persons since 2010; and (4) Claimant Dominguez and her husband have had no credit cards since 2010. (Doc. 33 at 7–8.)

Claimant Dominguez has never paid the property taxes for the Property. (Doc. 33 at 13.) Claimant Dominguez has not paid the utility bills for the Property. (*Id.* at 14.) Claimant Dominguez was unable to procure utility records for the Property because she was not the account holder and was not entitled to such information. (*Id.* at 13.) Claimant Dominguez has never had an insurance policy on the Property. (Pl. Ex. 54 at 3.)

On February 1, 2015, Claimant Dominguez visited Ms. Flores. (Pl. Ex. 8 at 22.) Claimant Dominguez told Ms. Flores that there was a possibility that Claimant Dominguez would lose the Property because "her brother was involved in some mafioso activities." (*Id.* at 23.) Claimant Dominguez offered Ms. Flores money if she would help Claimant Dominguez to

---

[2] The United States submitted the documentation concerning 8285 Lucky Drive.

11

save the Property from forfeiture. (Pl. Ex. 8 at 24–26.)

## III. DISCUSSION

This civil *in rem* forfeiture proceeding is governed by the Civil Asset Forfeiture Reform Act (CAFRA), 18 U.S.C. § 983. Under CAFRA, the United States bears the burden of proof to establish by a preponderance of the evidence that the Property is subject to forfeiture. *See* 18 U.S.C. § 983(c)(1). The United States may rely on circumstantial evidence to establish its burden of proof. *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 510 (5th Cir. 2008); *United States v. $84,615 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir. 2004).

Property is subject to forfeiture when: "(1) furnished or intended to be furnished in exchange for a controlled substance, (2) traceable to a controlled substance exchange, or (3) used or intended to be used to facilitate a violation of the Controlled Substances Act." *United States v. $148,840.00 in U.S. Currency*, 521 F.3d 1268, 1270 (10th Cir. 2008). The United States is not required to connect the property to "a particular drug transaction." *United States v. $21,055.00 in U.S. Currency*, 778 F.Supp.2d 1099, 1103 (D. Kan. 2011). Rather, the United States need only trace the property to drug trafficking generally. *Id.* at 1104. When considering evidence relating to drug transactions, "the court eschew[s] clinical detachment and endorse[s] a common sense view to the realities of normal life applied to the totality of the circumstances." *United States v. $13,000.00 in U.S. Currency*, 858 F.Supp.2d 1194, 1199 (D. Colo. 2012).

The record, construed in the light most favorable to Claimant Dominguez, establishes that Eidolfo Dominguez-Lopez was involved in drug trafficking and money laundering in 2011 and 2012. Claimant Dominguez's claim that she did not know about her family member's criminal activities until they were arrested is undercut by the fact that she lived with Eidolfo Dominguez-

Lopez from January 2011 to July 2012. Eidolfo Dominguez-Lopez negotiated the purchase of the Property and paid for the Property during the same time period. Eidolfo Dominguez-Lopez paid for significant improvements to the Property after the purchase. Claimant Dominguez told Ms. Flores she and her husband would live in the casita and that Eidolfo Dominguez-Lopez and his family would reside in the main house. Eidolfo Dominguez-Lopez's wife, Maria Vidales, and family reside at the Property. Claimant Dominguez and Eidolfo Dominguez-Lopez lacked sufficient legitimate income to purchase and finalize construction of the Property. These factors are sufficient to establish that the money involved in this transaction constituted proceeds from drug trafficking. *See United States v. Totaro*, 345 F.3d 989, 996 (8th Cir. 2003); *United States v. Herron*, 97 F.3d 234, 237 (8th Cir. 1996); *United States v. Parcels of Land*, 903 F.2d 36, 40–42 (1st Cir. 1990) (affirming the district court's grant of summary judgment for the government and concluding that the property at issue was traceable to drug trafficking based on "scant evidence in the record of any 'substantial' sources of legitimate income" for the property owner).

In response to the United States Motion for Summary Judgment, Claimant Dominguez submitted an affidavit in which she averred that she purchased the property using proceeds from a sale of cattle, property given to her by her father, proceeds from the sale of property in El Paso, and from money she earned and saved. (Doc. 57-1.) In her response brief, Claimant Dominguez states that she "furnished documents in Spanish from the State of Chihuahua which she maintains corroborate her position." (Doc. 57 at 3.) However, no such documents appear in the record. Claimant Dominguez submitted only her affidavit in support of her conclusory assertions. (*Id.*) As such, her affidavit, without more, is insufficient to establish a genuine dispute of material fact. *See $21,055.00 in U.S. Currency*, 778 F.Supp.2d 1099, 1102–03 (D.

Kan. 2011) ("Nor is a conclusory, self-serving affidavit by a claimant sufficient to create a genuine issue of material fact regarding the source of money without corroborating documentation.").

It bears underscoring that "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings[; they] must be based on more than mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citation omitted). Additionally, some of the statements in the affidavit are barred by Judge Lynch's Order. (Doc. 33.) Most notably, Claimant Dominguez's affidavit is conclusory and self-serving, and therefore unpersuasive. *See Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) ("We do not consider conclusory and self-serving affidavits."); *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002) (same); *Moore's Federal Practice* § 56.41[1][c] ("Merely restating a pleading, submitting new pleadings, or making bald assertions in a legal memorandum, or even in an affidavit, will not enable the nonmovant to withstand a properly supported summary judgment motion.").

Accordingly, Claimant Dominguez failed to sufficiently rebut the United States' corroborated contention that the Property was purchased with the proceeds of drug trafficking or with money that is traceable to drug trafficking and that the Property was the subject of a financial transaction that was designed to conceal the source of proceeds of drug trafficking. As a result, the Property is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A) (providing for the forfeiture of property involved in a financial transaction to conceal the proceeds of drug trafficking) and 21 U.S.C. § 881(a)(6) (providing for the forfeiture of property purchased with drug proceeds).

The United States has met its burden proving the Property is subject to forfeiture and a substantial connection between the Property and criminal activities of drug trafficking and money laundering. Notwithstanding the United States' showing, Claimant Dominguez contests the forfeiture, claiming that she is a bona fide purchaser or innocent owner. (Docs. 7 and 57.)

CAFRA defines an "innocent owner" as, in relevant part, an "owner who did not know of the conduct giving rise to the forfeiture." 18 U.S.C. § 983(d)(2)(A)(i). Notably, to qualify as an innocent owner, the claimant must prove she has an ownership interest as defined in the statute. *See United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003). As relevant here, the statute defines the term "owner" to include "a person with an ownership interest in the specific property sought to be forfeited," 18 U.S.C. § 983(d)(6)(A), and to exclude "a nominee who exercises no dominion or control over the property." 18 U.S.C. § 983(d)(6)(B)(iii). These statutory requirements reflect the fact that "things are often not what they appear to be, especially in the world of drug trafficking." *United States v. One 1990 Beechcraft*, 619 F.3d 1275, 1278 (11th Cir. 2010) (quotation and citation omitted). "[T]he very premise of requiring both an ownership interest and dominion or control is that people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name." *Id.* (quotation and citation omitted).

The Court finds Claimant Dominguez has not met her burden of establishing she is an innocent owner by a preponderance of the evidence. Claimant Dominguez's evidence consists of her statements that she provided the funds to purchase the Property and she asked her brother to help her to purchase of Property and finalize construction "because he is more qualified . . . to handle those types of dealings." (Doc. 57-1.) However, Claimant Dominguez provides no

evidence other than her statement.  A conclusory, self-serving affidavit lacking any supporting evidence is insufficient to create a genuine issue of material fact.  *See Ellis*, 779 F.3d at 1201; *Garrett*, 305 F.3d at 1213.  Moreover, an innocent owner claim fails if the claimant cannot prove that she is nothing more than a straw owner.  *United States v. Carrell*, 252 1193, 1204–05 (11th Cir. 2001).  Construed in the light most favorable to Claimant Dominguez, the record establishes that she was nothing more than a straw owner of the Property.

After reviewing the record as a whole, and construing the evidence in the light most favorable to Claimant Dominguez, the Court concludes Claimant Dominguez's evidence does not create a genuine issue of material fact as to whether or not the Property is subject to forfeiture.  For the Court to believe Claimant Dominguez's unsupported statements would require the Court to turn a blind eye to the summary judgment evidence.  Consequently, the Court concludes the Claimant Dominguez has failed to meet her burden of establishing the innocent owner defense.

## IV.    CONCLUSION

The record establishes that the Property was purchased with the proceeds of drug trafficking or with money that is traceable to drug trafficking and that the Property was the subject of a financial transaction that was designed to conceal the source of proceeds of drug trafficking. Claimant Dominguez was listed as a straw owner of the Property in order to conceal the source of the proceeds of drug trafficking used to purchase the Property.  Accordingly, the Property is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A).

**THEREFORE,**

**IT IS ORDERED** that Plaintiff's Motion for Summary Judgment (Doc. 50) is **GRANTED**.

_____
**ROBERT C. BRACK
UNITED STATES DISTRICT JUDGE**